# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

SPRINT SPECTRUM, L.P.,

     Plaintiff,                          Case No. 04-72159

v.                                  Hon. Gerald E. Rosen

CHARTER TOWNSHIP OF BRANDON,

     Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on    April 1, 2008   

PRESENT:   Honorable Gerald E. Rosen
                  United States District Judge

## I.  INTRODUCTION

In the present suit, Plaintiff Sprint Spectrum, L.P. ("Sprint") challenges the

decision of the Defendant Charter Township of Brandon (the "Township") to deny

Sprint's application for special land use and site plan approval for the placement of a

wireless communication tower on a parcel of Township property leased from an adjacent

property owner.  Based on this denial, Sprint has asserted claims under the

Telecommunications Act of 1996 (the "Act"), as codified at 47 U.S.C. § 151 *et seq.,* as

well as state-law claims.  This Court's subject matter jurisdiction rests upon Sprint's

assertion of claims arising under federal law.  See 28 U.S.C. § 1331(a).

Presently before the Court is Sprint's motion for partial summary judgment, through which Sprint seeks an award of summary judgment in its favor on its federal Telecommunications Act claims.[1] In support of this motion, Sprint argues that the Township's denial of its application was contrary to the Act's requirement that such decisions be supported by substantial evidence. Alternatively, Sprint contends that the Township's decision violated the Act's prohibition against local government regulations that "prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II).[2]

---

[1]Sprint notes in its motion that its state-law claims would be moot if the Court were to grant summary judgment in its favor on either of its two Telecommunications Act claims and award the injunctive relief sought in its complaint.

[2]Apart from Sprint's motion, the Township has moved for the dismissal of this action on the ground that Sprint's claims are tantamount to an appeal from a quasi-judicial decision, and thus lie outside this Court's subject matter jurisdiction under the Rooker-Feldman doctrine. See Kawecki v. County of Macomb, 367 F. Supp.2d 1137, 1140-42 (E.D. Mich. 2005) (describing this doctrine). Yet, as Sprint points out, this Court has *original,* not appellate, subject matter jurisdiction over this action, in light of the Telecommunications Act provision that expressly authorizes suits such as the present one, brought by "[a]ny person adversely affected by any final action or failure to act by a State or local government." 47 U.S.C. § 332(c)(7)(B)(v). While a claim under this provision is, in a sense, an "appeal" from an adverse decision, it is one that is explicitly permitted under the Act, so that Sprint need not invoke any sort of inchoate federal district court appellate jurisdiction of the sort that would implicate the Rooker-Feldman doctrine.

To be sure, the Township correctly observes that Sprint could have mounted a state-law challenge to the Township's decision in a Michigan court. Yet, the Township has not identified any authority for the proposition that Sprint was *compelled* to exhaust all such state-law remedies before proceeding to federal court. As the Township itself acknowledges in its motion, the decision at issue here was a "final action" within the meaning of the above-cited Telecommunications Act provision that authorizes Sprint's federal claims in this case. Further, it is clear that Sprint was free to choose federal rather than state court as the forum in which to litigate these claims. See Telespectrum, Inc. v. Public Service Comm'n, 227 F.3d 414, 421-22 (6th Cir. 2000). Under these circumstances, the Court rejects the Township's challenge to its subject matter jurisdiction over this case.

Sprint's motion has been fully briefed by the parties. Having reviewed the parties' submissions in support of and opposition to this motion and the accompanying administrative record, the Court finds that the pertinent facts and legal arguments are fully presented in these written materials, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Sprint's motion "on the briefs." <u>See</u> Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan. This opinion and order sets forth the Court's rulings on this motion.

## II. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

Plaintiff Sprint Spectrum, L.P. ("Sprint") operates a nationwide wireless communication network. After its engineers determined that there was a gap in its wireless coverage along state highway M-15 between Interstate 75 to the south and Interstate 69 to the north, Sprint began to investigate sites in Defendant Brandon Township (the "Township") where it could place the necessary wireless communications facilities, including an antenna structure and related equipment, to alleviate this coverage gap.

In the course of this investigation, Sprint identified a search ring within which its facilities would need to be located in order to address its coverage gap, and then set about determining which properties might be available within or near this search ring. This search was constrained by the Township's zoning requirements, which Sprint construed as limiting the placement of its facilities to properties in the Rural Estates ("RE") zoning

district with a minimum size of 40 acres.[3]  Upon inquiring of each owner of property that

was located within or near Sprint's search ring and satisfied the Township's zoning

requirements, Sprint found that only one property owner, Scott Constable, was interested

in executing a lease for the placement of Sprint's facilities on his property.

Accordingly, in late 2002, Sprint began the process of applying for the necessary

Township planning commission approval for placement of a 190-foot wireless

communication tower and related equipment on a parcel of property owned by Mr.

Constable and located at 3211 Allen Road.  This parcel was 58 acres in size and shared by

Mr. Constable's residence, with access to Sprint's proposed facilities via a road split off

from Mr. Constable's driveway.  As stated by the Township's planning consultant, David

Donnellon, in a January 6, 2003 site plan review report, the location on the property

where Sprint proposed to place its tower was "set well off the road and in a dense wooded

area."  (Item 6 at 3.)[4]  Mr. Donnellon further stated that Sprint's tower would be

"relatively obscure in close proximity to the structure," but would be "relatively visible

from a distance, as the monopole will extend high above the trees."  (Id. at 3.)  In

addition, because access to Sprint's facilities would be "off the driveway to [Mr.

Constable's] home" and would be "infrequent," Mr. Donnellon opined that "the

---

[3]As discussed below, the Township has questioned this interpretation of its zoning
ordinance, arguing in this litigation — albeit not in the course of the proceedings before its
planning commission — that Sprint also could have placed its facilities on property in a General
Business ("C-2") district.

[4]All citations to the record will refer to item numbers within the stipulated administrative
record provided by the parties.

homeowner, let alone the neighbors, will hardly know the facility is in the area." (Id.)

Under the Township zoning ordinance, Sprint's proposed placement of a wireless communication tower on Mr. Constable's property was a special land use that required the approval of the Township's planning commission. The planning commission first addressed Sprint's proposal at a January 14, 2003 meeting, where it heard from Sprint representatives, Mr. Donnellon, and a number of local residents who expressed their opposition to Sprint's plan. (See Item 7.)[5] The planning commission voted at that meeting to table Sprint's request while it awaited further information and reports.

In a January 23, 2003 report, Mr. Donnellon addressed several of the concerns raised at the recent planning commission meeting. Regarding the possible effect of Sprint's wireless tower on the value of nearby properties, Mr. Donnellon stated that this question hinged on "a variety of factors," and he suggested that any such impact could be mitigated by moving Sprint's tower to a location on Mr. Constable's property that was farther away from the nearest homes. (Item 9 at 1-2.) Mr. Donnellon also stated that Sprint had been directed to provide more information about alternative properties where its tower could be located, as well as the possibility that Sprint could eliminate its coverage gaps by placing antennas on existing cell towers.[6]

---

[5]The planning commission also heard from an attorney, Pat Parker, who stated that he was appearing on behalf of a number of neighboring property owners who wished to express their concern about Sprint's proposal. Mr. Parker also submitted a petition signed by several dozen Township residents expressing opposition to Sprint's plan. (See Item 8.)

[6]This placement of additional antennas on existing towers is referred to as "co-location," an issue that featured heavily in the Township's consideration of Sprint's request to erect a new

In July of 2003, Sprint's attorney, Wallace Haley, submitted supplemental information to the planning commission in support of the company's request. (See Item 16.) Mr. Haley stated that Sprint had agreed to move its wireless tower 200 feet farther away from the nearest neighbors' property lines (and 200 feet closer to Mr. Constable's home). He also indicated that the wetlands concerns expressed at the January 14 meeting were unfounded, and he attached a letter from the Michigan Department of Environmental Quality stating that agency's view that no wetland permit would be required. Finally, he stated that Sprint's coverage gap would not be eliminated by co-locating antennas on existing towers — including a tower on Seymour Lake Road, a tower on Rattalee Lake Road, or even a combination of the two — and he attached radio frequency (RF) propagation maps as evidence of gaps and areas of poor coverage that would remain despite such co-location.[7]

Mr. Donnellon responded to Sprint's additional information in an August 8, 2003 report. (See Item 19.) He opined, "[f]irst and foremost," that while Sprint had offered to move its tower approximately 200 feet farther away from the adjacent properties, there appeared to be no reason why the tower could not be moved still farther from these properties, as he had previously suggested. (Id. at 1.) Next, he questioned a number of

_____

wireless communications tower.

[7]Mr. Haley also noted that AT&T concurred in Sprint's analysis that co-location alone would not provide adequate coverage. Indeed, he pointed out that AT&T wished to place an antenna on Sprint's proposed tower, despite the fact that AT&T already had an antenna on the Seymour Lake Road tower.

Sprint's claims regarding the inadequacy of co-location to address its coverage gaps, and he opined that the RF maps submitted by Sprint were incomplete in certain respects. Finally, he questioned whether it was necessary that "every carrier . . . have 100% in-vehicle coverage over every square foot of every community regardless of how many structures it takes to do such a job." (Id. at 3.)

The planning commission next addressed Sprint's request at its August 12, 2003 meeting. (See Item 21.) Attorney Pat Parker once again spoke on behalf of a number of neighboring homeowners who questioned the need for another tower, were concerned about reduced property values, and felt that a "residential neighborhood is the wrong place for" such a tower. (Id. at 3.) The commission also heard from Mr. Haley, Mr. Donnellon, and the owner of the property, Mr. Constable, and then voted to table Sprint's request to allow the company the opportunity to provide more information on the subject of co-location and the prospect of a less obtrusive tower design.

In October of 2003, Sprint submitted to the planning commission nine additional RF propagation maps prepared by an outside consultant, Joseph Rizzo. (See Item 25.) These maps were intended to illustrate Sprint's existing coverage, the improvement that would result from the proposed new tower, and the coverage that could be achieved through co-location on the Seymour Lake Road tower, the Rattalee Lake Road tower, or both. In an accompanying letter, Mr. Rizzo also sought to address the questions raised in Mr. Donnellon's August 8, 2003 report regarding previous RF maps produced by Sprint.

Despite this additional information, Mr. Donnellon stated in an October 17, 2003

letter that he still had "several concerns regarding the accuracy of the information provided by" Sprint's independent consultant, and he suggested that the planning commission request further explanation of the analytical methods and data used to generate Sprint's latest maps. (Item 28.) He indicated, however, that if this information were provided, "then justification can be made for the need for an additional tower." (Id.) Mr. Donnellon also forwarded Mr. Rizzo's letter and maps to Larry Jefferies, an additional consultant retained by the Township to address the RF coverage issues raised by Sprint's proposal,[8] asking that he review these materials and provide his "technical interpretation." (Item 26.)

Following one or more meetings among Sprint's attorney and consultant, the Township's consultants, and at least one Township official, Mr. Donnellon prepared a December 30, 2003 report updating the planning commission as to the issues raised at the August 12, 2003 meeting and Sprint's efforts to address these issues. (See Item 30.) After recounting these issues, Mr. Donnellon first noted that it had been determined that the Rattalee Lake Road tower was not available for co-location. He then observed that, according to the propagation maps recently provided by Sprint, the company's proposed tower would not eliminate a coverage gap on a stretch of M-15 in Independence Township, a neighboring community to the south of the Township. Mr. Donnellon further opined that co-location on the Seymour Lake Road tower would "not only

---

[8]As discussed below, Sprint challenges Mr. Jefferies's qualifications to render expert opinions on matters of RF coverage and design.

provide[] better coverage on M-15 but this location also provides a significantly greater amount of coverage in other areas of Brandon Township" apart from the M-15 corridor, (id. at 1), and he suggested that coverage to the Township as a whole could be achieved through a combination of co-location at the Seymour Lake Road site and the possible use of a Detroit Edison high voltage tower.  Mr. Donnellon also faulted Sprint for purportedly failing to move its proposed tower farther from the properties adjacent to Mr. Constable's parcel, purportedly failing to consider a "flag pole type facility" that would be less obtrusive, and failing to address "[a]lternate technology" in "any detail."  (Id. at 1-2.)  In addition, he again questioned why the Township "has to approve every new site so that every part of the Township has great in-building coverage for every carrier," and why a rural township should have to "accept any and all towers."  (Id. at 1-2.)  He concluded his report by stating his view that, under the record compiled in connection with Sprint's proposal, the Township planning commission could "approve, approve with conditions or deny [Sprint's] request," and that the planning commission now had "sufficient information to make a decision on this matter."  (Id. at 3.)

Sprint's attorney, Mr. Haley, addressed Mr. Donnellon's latest report in a detailed point-by-point response dated January 13, 2004.  (See Item 31.)  Mr. Haley first explained that Sprint had focused on eliminating areas of poor or no coverage along the M-15 corridor, as opposed to in other areas of the Township, because of the high traffic volumes on this road and the concomitant need for enhanced cellular phone coverage, including emergency 911 coverage, along this route.  Thus, while the area targeted by

Sprint's proposed tower was perhaps physically smaller than other areas of the Township that might achieve more coverage gains through co-location on the Seymour Lake Road tower, Mr. Haley opined that this focus was justified by the "over 20,000" drivers who daily traversed the two-mile stretch of M-15 that Sprint sought to address.  (Id. at 3, 5.)

With regard to Mr. Donnellon's assertion that co-location on the Seymour Lake Road tower would provide "better coverage" along M-15, Mr. Haley asserted that "neither Mr. Donnellon nor the Township's outside RF consultant have provided any evidence that this is true,"[9] and he cited Sprint's propagation maps and additional data provided by AT&T as proof that, to the contrary, co-location at the Seymour Lake Road site would not adequately address Sprint's existing coverage gap on M-15.  (Id. at 4-5.)[10] Next, while he agreed with Mr. Donnellon's point that Sprint's proposed tower would not alleviate a coverage gap along M-15 in adjacent Independence Township, Mr. Haley opined that a single tower could not eliminate the gaps in both Brandon and Independence Townships in light of the "topography and wooded nature of the area."  (Id. at 5.)  As to

_____

[9]Indeed, Mr. Haley noted that the Township's RF consultant, Mr. Jefferies, had yet to provide any report or findings as to Sprint's need for its proposed tower, despite Sprint having been billed over $1,000 to date for this consultant's services.  (See id. at 3.)  Mr. Haley further noted that Mr. Donnellon's December 30 report did not even mention Mr. Jefferies or any findings he might have made.

[10]In further support of this proposition, Mr. Haley again noted that AT&T wished to co-locate on Sprint's proposed tower, despite the fact that AT&T already had a facility at the Seymour Lake Road site.

Mr. Donnellon's suggestion that Sprint had failed to address alternate technologies,[11] Mr. Haley stated that Sprint's consultant had advised him that no such available alternatives would alleviate Sprint's coverage concerns. (Id. at 4.)

With regard to the placement and appearance of Sprint's proposed tower on Mr. Constable's property, Mr. Haley stated that, contrary to Mr. Donnellon's assertion in his latest report, Sprint had already agreed to use a 175-foot "stealth flagpole" design, as opposed to the 190-foot tower sought in its initial proposal. (Id. at 4.) Mr. Haley opined that "[t]his alternate design is visually unobtrusive," and he provided photographs of a similar 175-foot flagpole tower at another location to illustrate this point. (Id.; see also Item 31, Ex. F.) He further stated that Sprint's proposed location of the tower on Mr. Constable's property far exceeded the Township's setback requirements, and that Mr. Donnellon's proposed location, if adopted, would "result in the cutting of 40-60 mature trees for a move that would not affect any view of the tower," but he indicated that Mr. Constable was willing to accept Mr. Donnellon's proposed relocation of the tower on his property "if the Commission desires such a move." (Id. at 6.) Finally, Mr. Haley rejected the proposition, as advanced in Mr. Donnellon's report, that Sprint had ever taken the position that the Township was obligated to approve "every new site" requested by a carrier, and he noted that, to his knowledge, "the Township has not been inundated by

---

[11]Mr. Haley noted that Mr. Donnellon had raised the issue of alternate technology for the first time in his latest report. More generally, Mr. Haley complained that "[a]fter nearly nine months, [Mr. Donnellon] continues to raise new issues," posing concerns about his "personal bias" against Sprint's proposal and the "fairness and accuracy" of his reports. (Id. at 6.)

applications for cell sites." (Id. at 5-6.)

The Township planning commission addressed Sprint's proposal for the third time at its January 13, 2004 meeting. (See Item 33.) According to the minutes of this meeting, Mr. Donnellon noted that he had met with Sprint's representatives and had been provided a number of RF maps, and he stated that "[c]olocation on existing area towers will not cover the area of M-15 where there is a lack of service north of Oakhill Road." (Id. at 2.) Mr. Donnellon also was asked whether he had received any reports from the RF consultant retained by the Township, and he responded that he had not. Mr. Haley, appearing along with Sprint's outside consultant, Mr. Rizzo, an AT&T project manager, and two of Sprint's RF engineers, again spoke in support of Sprint's proposal, and produced photographs of flagpole-style towers in rural settings to illustrate how the proposed tower would appear to its neighbors. Mr. Parker once again appeared on behalf of the neighboring property owners, stating his appreciation of the efforts Sprint had made to make its tower less obtrusive, but voicing the neighbors' continued opposition to the proposed placement of a tower in a residential area and their "concern[s] about lowered property values." (Id.) While one member of the planning commission expressed his frustration that "this has dragged on for almost a year now," and that the Township's RF consultant had failed to produce any reports or studies in time for the meeting, (id. at 3), the commission nonetheless voted 3-2 to table Sprint's request until it received the RF consultant's report.

On January 15, 2004, the Township's RF consultant, Mr. Jefferies, produced his

first report.[12]  He observed that, according to the propagation maps provided by Sprint —
which, in his view, were "90 - 100% accurate" — the company currently had three areas
of no coverage along M-15, and that co-location on the Seymour Lake Road tower would
leave two areas with "very poor service[]" while providing some improvement between
these "two 'dead spot' service areas."  (Item 34 at 1.)  With Sprint's proposed tower, in
contrast, "the coverage is vastly improved . . . to the two most northern 'dead spots,'" but
service to the southernmost area in Independence Township would remain "very poor."
(Id.)  Mr. Jefferies concluded that "[t]he addition of [Sprint's proposed tower] provides
adequate coverage and improves service along the M-15 Route in Brandon Township,"
but that further study would be necessary "[i]f —15 requires service along the entire
route, including coverage in both Brandon and Independence Townships."  (Id. at 2.)

Following further discussion and correspondence — including a February 3, 2004
letter in which Mr. Haley stated that Mr. Constable had agreed to relocate Sprint's
proposed tower to the spot advocated by Mr. Donnellon, (see Item 39) — Mr. Donnellon
prepared his final March 31, 2004 report to the Township planning commission.  (See
Item 43.)  Mr. Donnellon first stated that a number of issues had been addressed,
including the proposed tower's size and location on Mr. Constable's property, but that the

_____

[12]A few days earlier, on January 12, 2004, Mr. Jefferies sent an e-mail message to Mr.
Donnellon, stating that Sprint's consultant, Mr. Rizzo, had provided him with some RF
propagation data for Sprint's possible co-location on the Seymour Lake Road tower, and that he
had concluded based on this data that this co-location "will not provide adequate coverage to the
'dead spots' along the M-15 corridor."  (Item 32.)  He further stated that Sprint's proposed tower
would service two of the three dead spots along this corridor, leaving "the one furthest south . . .
without coverage."  (Id.)

issues of co-location and the need for the proposed tower had "not been addressed." (Id. at 1-2.) As to co-location, Mr. Donnellon continued to assert that the use of the Seymour Lake Tower location "should enhance Sprint service in not only the south central portion of the Township but also in the M-15 corridor," and he suggested that Sprint should be compelled to try this option before erecting a new tower. (Id. at 2-3.) Regarding Sprint's need for the tower, Mr. Donnellon opined that Sprint had not "offered any real empirical data to document the level of service" reflected in its propagation maps, and he cited an accompanying report by Mr. Jefferies (discussed below) that found a "reasonable" level of service, with reconnection of dropped cell phone calls "in less than one minute in most situations." (Id. at 2.) Thus, while "the level of service is not perfect," Mr. Donnellon opined that "all of the information submitted by [Sprint] shows reasonable coverage along most of M-15 in Brandon Township," particularly where this service could be "enhance[d]" with co-location on the Seymour Lake Road tower. (Id. at 3.)

Finally, Mr. Donnellon expressed his view that Sprint's proposed "190-foot high monopole"[13] would have a "significant visual impact" on the neighboring properties, contrary to the Township zoning requirement that a special land use "should be in harmony with the surrounding neighborhood." (Id. at 3.) Thus, Mr. Donnellon concluded that "I cannot recommend approval of this special use for the requested location." (Id. at 4.)

---

[13]As noted earlier, Sprint had by this time revised its proposal to 175-foot flagpole-style tower.

As noted, Mr. Donnellon's report was accompanied by a single-page March 31, 2004 report by Mr. Jefferies, the Township's RF consultant. (See Item 43 at 6.) Mr. Jefferies stated that he had tested Sprint's coverage in two areas along M-15 by placing calls from two different cell phones. He reported that the calls were placed on the street and outside a vehicle, and that additional signal degradation could be expected inside a vehicle. He also noted that his tests were performed "during a non-vegetation growth period," and that additional foliage "may have an impact on the quality of service in these test areas." (Id.) Against this backdrop, Mr. Jefferies found that the call quality was "marginal" in both test areas using either phone, and that calls placed while traveling at posted speeds along M-15 "may drop service," with such calls being "reconnected in less than a one (1) minute time frame." (Id.)

Mr. Jefferies also prepared an April 26, 2004 addendum to his report. (See Item 47.)[14] This report elaborated on the test methodology used to prepare the March 31, 2004 report, and also provided further information on the strength of Sprint's signal, as determined by the number of "bars" shown on each phone at each test location. Mr. Jefferies then reiterated his finding in his report that his calls from the two test areas along M-15 "were processed," but that the "call quality was rated as poor." (Id. at 4.)[15] After recounting these and his other previous findings, Mr. Jefferies concluded that Sprint's

---

[14]This report evidently was in lieu of Mr. Jefferies's appearance at the next planning commission meeting, which he was unable to attend.

[15]He noted that the quality of calls placed through Cingular's cell phone service was "fair to good," which, in his mind, "discredit[ed] any type of insignificant coverage concern." (Id.)

proposed tower was "unnecessary for coverage purposes along M-15 in Brandon Township at this time." (Id. at 5.)

Sprint's attorney, Mr. Haley, addressed Mr. Donnellon's latest report and Mr. Jefferies' report and addendum in a statement dated April 27, 2004. (See Item 48.) Mr. Haley first questioned Mr. Jefferies's qualifications as an RF consultant, and challenged his reliance on cell phone signal strength meters as a measure of wireless service. In any event, Mr. Haley observed that Mr. Jefferies's own test results, despite their many limitations, still revealed poor service at many points along M-15, and that the one-minute reconnection time reported by Mr. Jefferies correlated to a one-mile coverage gap.[16] With regard to Mr. Donnellon's questions about the reliability of Sprint's propagation maps, Mr. Haley cited Mr. Jefferies's acknowledgment in his January 15, 2004 report that these maps were 90 to 100 percent accurate. Finally, as to co-location on the Seymour Lake Road tower, Mr. Haley cited Mr. Jefferies's findings that two coverage gaps would remain despite this co-location, and he took issue with Mr. Donnellon's suggestion that Sprint should first pursue a co-location "that it does not need and then provide test data to show that it needs the Constable site." (Id. at 4.) Mr. Haley contended that such an effort was "expensive" and "unnecessary," in light of the data Sprint had presented showing that

---

[16]Sprint's outside consultant, Mr. Rizzo, reiterated this point in an April 19, 2004 letter, noting that the one-minute reconnection time cited by Mr. Jefferies established the very interruption in service that Sprint sought to eliminate through the proposed tower. (See Item 46.) With regard to Mr. Jefferies' observation that another carrier, Cingular, provided better coverage along M-15, Mr. Rizzo opined that this again demonstrated Sprint's need for the proposed tower, so that the company could "compete fairly and provide reasonable coverage to [its] customers." (Id. at 2.)

this co-location would not eliminate the coverage gaps targeted by the proposed tower and acknowledged by Sprint's and the Township's consultants alike.  (Id.)

On April 27, 2004, the Township planning commission held its final meeting on Sprint's proposal, with essentially the same people appearing and stating their support for or opposition to the proposed tower.  (See Item 50.)  Mr. Donnellon, for example, acknowledged that Sprint had altered the placement and appearance of its tower, and that the RF propagation data submitted by Sprint was "fairly reliable," but he opined that his and Mr. Jefferies's latest reports showed that "[t]here is not a significant problem" in Sprint's coverage and that "there are other solutions to enhance coverage."  (Id. at 7-10.) Mr. Haley, in turn, read his latest written statement into the record, and he and Sprint's consultant, Mr. Rizzo, explained the flaws in Mr. Jefferies's reliance on cell phone signal strength meters and the differences in the coverage provided and technology used by Sprint versus its competitors.  Mr. Haley also addressed the planning commission's inquiries about Sprint's efforts to address its coverage gap along M-15 in Independence Township, which would remain even if its proposed tower in Brandon Township were approved and erected.  Finally, Mr. Parker again spoke on behalf of neighboring property owners, observing that it was "unfortunate that the Zoning Ordinance picks a residential classification as a possible spot for one of these towers" and urging the Township to "rethink" this aspect of the ordinance, but nonetheless opining that Sprint's proposed tower "does not fit in this particular residential neighborhood" and would "substantially change the character of the neighborhood."  (Id. at 32-34.)

17

After hearing these various statements in support of or opposition to Sprint's proposal, the Township planning commission denied Sprint's request in a 4-2 vote. The stated reasons for this decision were: (i) that the location and character of Sprint's proposed tower were not in harmony with the development of the surrounding area and the zoning district in which it would be placed; (ii) that the nature of the tower structure would discourage future residential construction, thereby having a negative effect on the property values of existing homes; and (iii) that Sprint had failed to exhaust its co-location possibilities. (See id. at 53-54.) Sprint then brought the present suit, contending that the Township's decision is contrary to the federal Telecommunications Act of 1996 and state law.

### III. ANALYSIS

**A.     The Standards Governing Sprint's Motion**

Through the present motion, Sprint seeks an award of partial summary judgment in its favor as to its two federal claims arising under the Telecommunications Act of 1996. Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

In addressing the first of Sprint's two federal claims — *i.e.,* whether the Township's decision is supported by substantial evidence — the parties have confined

their discussion and argument solely to the record compiled in the course of the proceedings before the Township planning commission. As to this claim, then, there is no disagreement as to the underlying facts and evidence. Rather, the parties' disagreement turns upon the purely legal question whether the agreed-upon record contains substantial evidence in support of the Township's decision. Accordingly, this matter is amenable to resolution as a matter of law, and the Court turns to this inquiry.

**B.   The Township's Denial of Sprint's Application Is Not Supported by Substantial Evidence in the Record.**

**1.   The "Substantial Evidence" Standard of Review**

As the first of its two federal-law challenges to the Township's denial of its application to place a wireless communication tower on the Constable property, Sprint argues that this decision is not "supported by substantial evidence contained in a written record," 47 U.S.C. § 332(c)(7)(B)(iii), and thus should be overturned. The Sixth Circuit has recognized that "the 'substantial evidence' standard of section 332 is the traditional standard employed by the courts for review of agency action." Telespectrum, supra, 227 F.3d at 423; see also New Par v. City of Saginaw, 301 F.3d 390, 396 (6th Cir. 2002). The court further explained:

> Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support the conclusion. This Court reviews the entire record, including evidence opposed to the result of the decision. We look to whether the agency explained any credibility judgments it made and whether it gave reasons for crediting one piece of evidence over another. This Court must examine the evidence as a whole, taking into account whatever in the record fairly detracts from its weight.

Telespectrum, 227 F.3d at 423 (internal quotation marks and citations omitted).[17]

In this case, the Township has identified three separate grounds for its denial of Sprint's application. Thus, it is Sprint's burden to establish that none of these grounds is supported by substantial evidence in the record compiled in the proceedings before the Township planning commission.

### 2. Lack of Harmony with the Surrounding Area and Zoning District

The first reason given by the Township planning commission for denying Sprint's application was that the location and character of Sprint's proposed wireless tower were not in harmony with the development of the surrounding area and the Rural Estates ("RE") zoning district in which the tower would reside. Although the question is a close one, the Court agrees with Sprint that this basis for denial is not supported by substantial evidence in the record.

As noted by Sprint, the evidence as to the proposed tower's lack of harmony with the surrounding area and the RE zoning district derives from two sources. First, a number of nearby residents, as well as an attorney representing some of these nearby property owners, voiced their objections to Sprint's proposal at one or more hearings or signed

---

[17]In light of the Sixth Circuit's express statement that "substantial evidence" review under § 332 is governed by the same standards traditionally applied in judicial review of agency action, the Court need not join in the parties' debate as to whether the Sixth Circuit has chosen sides in a perceived split of authority regarding whether a municipality's decision should be given "substantial deference" or should be subject to "rigorous review." See MIOP, Inc. v. City of Grand Rapids, 175 F. Supp.2d 952, 955 (W.D. Mich. 2001) (discussing these two "trends" in the courts' application of the "substantial evidence" standard, and finding that the Sixth Circuit has joined the "rigorous review" trend). Rather, the Court finds that Sprint's challenge in this case is readily resolved under the traditional understanding of "substantial evidence" review.

petitions opposing this proposal. In addition, the Township's consultant, David

Donnellon, raised questions in at least some of his reports as to whether Sprint's proposed

tower satisfied the requirement under the Township zoning ordinance that a special land

use must be in harmony with the surrounding neighborhood.

As to the first of these two categories of evidence, Sprint cites the rulings of

various courts that generalized objections by local residents regarding the aesthetics (or

lack thereof) of a communication tower do not, standing alone, rise to the level of

substantial evidence that could sustain a governmental decision under § 332 of the

Telecommunications Act. See, e.g., New Par, 301 F.3d at 398; Telespectrum, 227 F.3d at

424; Laurence Wolf Capital Management Trust v. City of Ferndale, 61 F. App'x 204, 218

(6th Cir. Apr. 10, 2003); Cellular Telephone Co. v. Town of Oyster Bay, 166 F.3d 490,

496 (2d Cir. 1999). As the First Circuit has observed, while "[f]ew people would argue

that telecommunications towers are aesthetically pleasing," an "aesthetic judgment must

be grounded in the specifics of the case" to qualify as substantial evidence. Southwestern

Bell Mobile Systems, Inc. v. Todd, 244 F.3d 51, 61 (1st Cir. 2001). Similarly, the

Seventh Circuit has reasoned that "[i]f blanket opposition to poles could count as

sufficient evidence for denying an application to build an antenna, the substantial-

evidence provision of the Telecommunications Act would be set at naught." Primeco

Personal Communications, Ltd. v. City of Mequon, 352 F.3d 1147, 1150 (7th Cir. 2003).

Yet, the resident concerns expressed in this case cannot readily be dismissed as

generalized objections. First and foremost, far more than a mere handful of nearby

property owners voiced their opposition to Sprint's proposal, thereby distinguishing this case from others in which the courts found evidence of only minimal citizen opposition. See Sprint Spectrum L.P. v. Charter Township of West Bloomfield, 141 F. Supp.2d 795, 800-01 (E.D. Mich. 2001) (distinguishing other cases on the ground that the tower in that case was opposed by a "significant number of community residents"). The record here discloses that several local residents spoke out against Sprint's plan at one or more public hearings before the planning commission, that an attorney appeared at these hearings on behalf of still more residents who opposed Sprint's plan, and that dozens more signed petitions in opposition to Sprint's proposed tower. Moreover, these objections went beyond mere opposition to any wireless communication tower located anywhere in the Township, and instead addressed, at least in some instances, the particular rural character of the surrounding neighborhood and the specific topography of the site on which Sprint's tower would be placed.

Under the particular circumstances of this case, however, the Court finds that the objections of the neighboring property owners do not constitute substantial evidence in support of the Township's decision. While these objections were not "generalized" in the broadest sense, their force was considerably blunted by the Township's own determination, through its zoning ordinance, that "antenna structures" may be placed on property in the Rural Estates district, so long as the parcel is 40 acres or larger and certain

setback and other conditions are met.[18]  Against this backdrop, the neighbors' opposition appears considerably more "generalized," in the sense that their very same objections could equally well be made to ***any*** antenna structure located in the Rural Estates district.

As acknowledged by the attorney for some of the adjacent property owners, Mr. Parker, it is "unfortunate that the Zoning Ordinance picks a residential classification as a possible spot for one of these towers." (Item 50 at 33.)  What is more, the ordinance imposes additional conditions of minimum lot size, required setbacks, and the like, each of which is plainly intended to mitigate the effect of a tower on its surrounding properties, and each of which indisputably was met by Sprint in this case.  Having, in essence, codified the set of circumstances in which a wireless tower may be erected in a Rural Estates district, the Township cannot rely on these same circumstances as grounds for determining that a particular tower is not in harmony with the surrounding Rural Estates properties.[19]  This is especially so where, as here, an applicant has taken several steps, at

---

[18]Sprint construes the zoning ordinance as dictating that its proposed tower could ***only*** be located on property zoned RE, while the Township cites a provision in its zoning ordinance that permits "[t]elevision and radio studios and towers" to be placed on property in General Business ("C-2") district.  Yet, regardless of whether Sprint's proposed structure qualifies as a "radio tower" within the meaning of this provision, Sprint correctly notes the absence of any evidence in the record that the Township ever suggested that Sprint consider C-2 as well as RE properties. Notably, while Sprint's representatives occasionally stated their view that the company was constrained to place its tower on property zoned RE, (see, e.g., Item 31 at 4), no Township representative ever corrected this purported "misconception."  In any event, the Township does not dispute that  wireless communication towers ***are*** permitted within a Rural Estates district under the zoning ordinance, regardless of whether they might be permitted elsewhere.

[19]Notably, nothing in the record refutes Sprint's assertion that Mr. Constable was the only owner of Rural Estates property who was willing to enter into a lease and whose property was within or near the "search ring" identified by the company's engineers for placement of a tower.

the request of Township representatives, to minimize the visual impact of its tower on the surrounding properties — *i.e.,* reducing the size of the tower, adopting a less obtrusive flagpole-type structure, and placing the tower in a wooded setting and at a location farther from the neighboring properties. Although the Court does not mean to diminish in any way the legitimate concerns of many Township residents that Sprint's tower is not fully consistent with the rural character of its surrounding neighborhood, the Court finds, under the circumstances presented here, that these objections do not serve as substantial evidence in support of the Township's decision.

The Court also — and far more readily — concludes that Mr. Donnellon's reports do not qualify as substantial evidence that Sprint's tower would not be in harmony with the surrounding area. As Sprint points out, Mr. Donnellon's initial review of the tower proposal acknowledged that the Township's lot size and setback requirements were met, observed that the proposed structure was "set well off the road and in a dense wooded area," and stated that there were "no real issues relative to the location and site arrangement." (Item 6 at 3.) While Mr. Donnellon subsequently raised various concerns about the tower's location and appearance, each of his suggested improvements was adopted by Sprint, including the relocation of the tower to a spot farther from the adjacent properties, the lowering of the tower, and the use of a flagpole-type design. At this point,

_____

Thus, there would be no basis for the conclusion that Sprint should have sought a different and somehow more "fitting" parcel of Rural Estates property upon which to build its tower, and the Township's decision does not rest upon any such finding.

any remaining reservations stated in his final March 31, 2004 report amounted to generalized questions about the placement of communication towers in residential districts, and do not rise to the level of substantial evidence in support of the Township's denial of Sprint's application.

Finally, Sprint correctly observes that the Township has identified no evidentiary support whatsoever for its determination that the proposed tower was not in harmony with the zoning district in which it would be located. As explained, the Township zoning ordinance expressly provides that such towers *are* permissible in a Rural Estates district, so long as certain additional conditions are satisfied (as they were here). This determination in the zoning ordinance stands directly contrary to the decision at issue here, and it is clear that the latter must yield to the former. See Laurence Wolf, 61 F. App'x at 219 (finding that the denial in that case was not supported by substantial evidence, where the proposed wireless antenna met all of the criteria for a variance under the defendant city's zoning ordinance). If the Township determines that towers such as the one proposed by Sprint are flatly incompatible with a Rural Estates district and should be placed elsewhere, it must amend its zoning ordinance to reflect this change in policy.

### 3.    Impact on Property Values

The second reason given by the Township planning commission for denying Sprint's application was that the nature of Sprint's proposed tower would discourage future residential development and thereby diminish the property values of existing homes. As noted by Sprint, there is no valuation evidence whatsoever in the record, and

25

none of Mr. Donnellon's several reports advances any claim of diminished property values. Rather, the evidence on this point consists solely of the unsupported statements of some residents and their representative, Mr. Parker, that Sprint's proposed tower would affect property values or "change the character of [the neighboring property owners'] investment." (Item 50 at 34.) Such unsupported statements of opinion have not been deemed "substantial evidence" within the meaning of § 332 of the Telecommunications Act. See Telespectrum, 227 F.3d at 424; cf. Sprint Spectrum, 141 F. Supp.2d at 801 (citing the "objective evidence" in that case "that residential property values may decrease as a result of the proposed tower"). Accordingly, this ground for the Township's decision is not supported by substantial evidence.

### 4.    Sprint's Failure to Exhaust Co-Location Possibilities

The third and final reason given for the Township planning commission's decision was that Sprint had not adequately explored the possibility of co-location on existing towers in order to meet its coverage needs. The sufficiency of the evidence as to this ground for the Township's decision plainly turns upon an assessment of the submissions by Sprint's engineers and RF consultant, on one hand, and the submissions of the Township's planning and RF consultants, on the other. While a simple "battle of the experts" presumably would leave the Township free to credit one expert's view over the other, the Court finds that the record in this case tilts the balance decisively toward Sprint's position, and leaves the Township's contrary choice without substantial evidentiary support.

There is no question that Sprint produced ample evidence in support of its
contention that there were appreciable gaps in its coverage along the M-15 corridor in the
Township, and that co-location — whether on the Seymour Lake Road tower alone or at
this site along with other existing towers — would at best only modestly reduce, and not
eliminate, these areas of poor to no coverage.  Most significantly, when Mr. Donnellon
opined in his August 8, 2003 report that the RF maps produced by Sprint to that point
were incomplete in certain respects, Sprint responded by submitting nine additional RF
propagation maps prepared by an outside RF consultant, Mr. Rizzo.  (See Item 25.)  Even
Mr. Donnellon conceded that if Mr. Rizzo provided the underlying data used to generate
his maps, "then justification can be made for the need for an additional tower."  (Item 28.)

The record indicates that this data, or something like it, must have been
forthcoming, at least to the satisfaction of the Township's RF consultant, Mr. Jefferies.  In
particular, Mr. Jefferies opined in his initial January 15, 2004 report that the maps
prepared by Mr. Rizzo were "90 - 100% accurate."  (Item 34 at 1.)  Presumably, this
assessment was based on information Mr. Jefferies had been provided about the
methodology used to prepare these maps.  Indeed, Mr. Jefferies himself confirmed in an
earlier January 12, 2004 e-mail message to Mr. Donnellon that Mr. Rizzo had given him
certain data that had been used to generate the RF propagation map showing the effect of
co-location on the Seymour Lake Road tower.  (Item 32.)  Based on this information, Mr.
Jefferies opined in this e-mail that co-location on the Seymour Lake Road tower would

not "provide adequate coverage to the 'dead spots' along the M-15 corridor." (Id.)[20]  This record, therefore, would certainly permit the conclusion that co-location at existing sites would not obviate the need for the proposed tower to address the gaps in Sprint's coverage along the M-15 corridor.

Nonetheless, the Township planning commission could permissibly have reached the opposite conclusion, so long as it had a substantial evidentiary basis for doing so. Certainly, there were statements in the record that would support this conclusion.  Mr. Donnellon asserted in his final March 31, 2004 report, for example, that co-location on the Seymour Lake Road tower "should enhance Sprint service in not only the south central portion of the Township but also in the M-15 corridor."  (Item 43 at 2.)  Similarly, in an April 26, 2004 addendum to his earlier report, Mr. Jefferies opined that co-location on the Seymour Lake Road tower would "provide improved service along the M-15 corridor, mainly between the two (2) 'dead zones' as depicted on the propagation map generated by Rizzo Consulting."  (Item 47 at 5.)[21]

---

[20]In light of these statements in Mr. Jefferies's e-mail and contemporaneous report, it is simply untenable to suggest, as Mr. Donnellon did in his March 31, 2004 report, that Sprint had failed to "offer[] any real empirical data to document the level of service" reflected in its propagation maps.  (Item 43 at 2.)  While one can perhaps debate the relative value of computer propagation models versus the cell phone tests conducted by Mr. Jefferies, there is no basis in the record for concluding that the former have *no* evidentiary value in establishing the level of Sprint's service.  Certainly, there is no indication that Mr. Donnellon has the qualifications to make such an assessment.  In any event, Sprint did not rely solely on computer models, but also produced the results of drive tests conducted by AT&T and Sprint.

[21]Notably, even in this final addendum, the Township's RF consultant, Mr. Jefferies, continued to rely on the propagation maps produced by Mr. Rizzo, once again refuting Mr. Donnellon's suggestion that Sprint's position on co-location was backed by insufficient data.

Yet, the problem with favoring these assertions over Sprint's position on co-location is that the evidence underlying these disparate views is ***essentially identical.*** Although Mr. Jefferies's opinions appear to have evolved over time — he stated in his initial January 15, 2004 report that there were two "dead spot" areas along the M-15 corridor where service would remain "very poor" despite co-location, (Item 34 at 1), but then concluded in his final addendum that Sprint's proposed tower was "unnecessary for coverage purposes along M-15 in Brandon Township," (Item 47 at 5)[22] — the underlying data upon which his opinions rested remained precisely the same. Specifically, it is clear that Mr. Jefferies relied on the propagation maps produced by Mr. Rizzo and his own cell phone tests performed along M-15 on March 15, 2004. As to the latter, Mr. Jefferies reported that the quality of calls placed on the street with Sprint phones was "marginal" in both of his two test areas, and that calls placed while traveling along M-15 at posted speeds "may drop service," with such calls being "reconnected in less than a one (1) minute time frame." (Item 43 at 6.) Moreover, regardless of the results of his cell phone tests, Mr. Jefferies necessarily was compelled to look to Sprint's propagation maps in order to address the impact of co-location — a fact that, as noted, is confirmed in Mr. Jefferies' final addendum. There was simply no way that Mr. Jefferies's cell phone tests could determine the improvement in coverage, if any, that would be achieved by co-location, and none of his reports suggests otherwise.

---

[22]As noted by Sprint, this evolution in Mr. Jefferies's opinions certainly suggests the possibility that he was pressured to change his views.

In short — and as Sprint's consultant, Mr. Rizzo, pointed out in an April 19, 2004 letter, (see Item 46) — Mr. Jefferies's cell phone tests served to ***confirm*** Sprint's evidence that its coverage in at least two areas along the M-15 corridor was poor at best.[23] Indeed, when Mr. Jefferies tested call quality along this corridor under conditions that Sprint sought to address — namely, in a traveling vehicle — he found that service was interrupted, with reconnection time of up to a minute. As observed by Mr. Rizzo, "[t]his interruption is the purpose of building" the tower proposed by Sprint. (Id.) Under this record, the only true issue that was left for the two parties and their consultants to debate was whether this existing coverage should be deemed sufficient, or whether Sprint should be permitted to construct a tower that would alleviate the acknowledged gaps in Sprint's coverage.

Yet, in denying Sprint's application, the Township planning commission did not weigh in on this dispute — it did not find, in other words, that Sprint had failed to demonstrate a need for an additional tower because its existing coverage was adequate. Rather, it determined that Sprint had inadequately exhausted the possibility of co-location before seeking to construct a new tower. As to this point, however, Sprint provided all of

---

[23]In light of this consistency of the parties' data and test results under different methodologies, the Court finds it unnecessary to address Sprint's challenge to Mr. Jefferies's qualifications to provide expert opinions on matters of RF coverage and design. He presumably would be deemed qualified to conduct the cell phone tests that he performed, and to report the results of these tests. Beyond this, the Court is inclined to agree with the Township that the various purported limits to Mr. Jefferies's expertise, as identified by Sprint, go only to the weight that his opinions should be given, and do not require that the planning commission or this Court entirely disregard those opinions.

the evidence found in the record, and both its own and the Township's RF consultants were in agreement as to what this evidence showed — namely, that co-location would not eliminate the dead spots in Sprint's coverage along the M-15 corridor, but would at best provide some degree of improved service between two of these still-existing dead spots.[24] Whatever value judgment might be made as to whether coverage with such areas of poor or no service should be deemed "good enough" or should warrant the construction of a new tower, the Township planning commission made no such judgment, but instead decided that Sprint should first pursue co-location before building such a tower. Because the record uniformly showed that any such attempt at co-location would have, at best, a very modest impact upon the coverage gaps that Sprint sought to address through its proposal, the Township's rejection of Sprint's proposal on this ground was not supported by substantial evidence.[25]

### 5. An Award of Injunctive Relief Is Appropriate.

Having found that the Township's denial of Sprint's application for special land use and site plan approval was not supported by substantial evidence, it remains only for the Court to determine the appropriate relief to award for this violation of the

---

[24]As Sprint points out, this view was shared by AT&T, which sought to co-locate on Sprint's proposed tower despite its existing antenna on the Seymour Lake Road tower.

[25]In light of the Court's conclusion that none of the grounds cited by the Township planning commission in denying Sprint's application was supported by substantial evidence, the Court need not reach the second argument advanced in Sprint's motion — namely, that the Township's decision impermissibly "ha[d] the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(b)(i)(II).

Telecommunications Act.  As noted by Sprint, the Sixth Circuit has held that injunctive relief is an appropriate remedy for the sort of violation found here.  See New Par, 301 F.3d at 399-400; Telespectrum, 227 F.3d at 419, 424.  In New Par, 301 F.3d at 400, for example, the Sixth Circuit upheld the award of an injunction directing the defendant city to grant the necessary approvals for the construction of a cellular communication tower, where the district court had concluded that there had been ample opportunity to raise any opposition to the tower, so that a remand "would serve no foreseeable useful purpose."

Precisely the same can be said here.  Sprint's application was pending before the Township planning commission for well over a year, and was the subject of discussion and consideration at four separate meetings.  Each of these meetings was accompanied by a public hearing, where local residents and their representatives were given opportunities to state their positions on Sprint's proposal.  Moreover, these lengthy proceedings resulted in a voluminous record, and it can scarcely be argued that any interested party was denied the opportunity to present evidence in opposition to Sprint's application. Under these circumstances, it is clear that a remand to the Township planning commission would serve no conceivable purpose, and the Township has not suggested otherwise in its submissions to this Court.  Consequently, the Court finds that the injunctive relief sought by Sprint should be granted, and an appropriate order will be entered.

# IV. **CONCLUSION**

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is DENIED. IT IS FURTHER ORDERED that Plaintiff's motion for partial summary judgment is GRANTED IN PART, in accordance with the rulings in this opinion and order.


s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated: April 1, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 1, 2008, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager